## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| William Parker,           ) <br> ) <br> Plaintiff,       ) <br> ) <br> v.            ) <br> ) <br> National Railroad Passenger Corporation,   ) <br> d/b/a Amtrak,      ) <br> ) <br> Defendant.     ) <br> ) | Civil No. 1:14-cv-01634 (APM) |

### MEMORANDUM OPINION

## I.      INTRODUCTION

Plaintiff William Parker filed this lawsuit against his former employer, Defendant National Railroad Passenger Corporation ("Amtrak"), alleging discriminatory treatment in violation of 42 U.S.C. § 1981, and the District of Columbia Human Rights Act, D.C. Code § 14.01.1 *et seq*. Plaintiff—an African-American police officer who worked in the Amtrak Police Canine Unit— asserts that Defendant terminated his employment on the basis of his race.  Defendant disagrees and instead asserts that it had a legitimate non-discriminatory reason to terminate him—namely, that Plaintiff had engaged in unethical behavior and then lied to Amtrak investigators about his conduct.

This matter is before the court on Defendant's Motion for Summary Judgment.  Having reviewed the pleadings and evidence, the court finds that no reasonable juror could conclude that

Defendant discriminated against Plaintiff when it terminated his employment. Accordingly, the court grants Defendant's Motion for Summary Judgment.[1]

## II.   BACKGROUND

### A.   Factual Background

In 2007, Amtrak hired Plaintiff to serve as a Captain in the Amtrak Police Department's (APD) Canine Unit. Def.'s Stmt. of Facts in Supp. of Mot. for Summ. J., ECF No. 29-2 [hereinafter Def.'s Stmt.], ¶ 1; Pl.'s Stmt. of Facts in Supp. of Opp'n of Def.'s Mot. for Summ. J., ECF No. 34-2 [hereinafter Pl.'s Stmt.], at 12, ¶ 1. After serving in this role for approximately four years, Plaintiff was promoted to Inspector—a management-level position—where he was responsible for overseeing, supervising, and training other Canine Unit officers. Def.'s Stmt. ¶¶ 2-3; Pl.'s Stmt. at 12, ¶ 2.

In September 2011, both the APD's Office of Internal Affairs ("Internal Affairs") and the Amtrak Office of the Inspector General ("OIG") received anonymous complaints concerning Plaintiff. Def.'s Stmt. ¶¶ 12, 22. Internal Affairs and OIG are distinct offices within Amtrak and have separate investigative authority. *Id.* ¶ 23. The complaints alleged, among other things, that Plaintiff co-owned a property in Maryland (the "Property") with a subordinate officer—Sarah Bryant—with whom he was romantically involved and that, as a result of their relationship, he was impermissibly steering overtime funds to Bryant. *Id.* ¶¶ 16, 22. Internal Affairs and OIG launched separate investigations into those allegations, which included interviewing witnesses and gathering evidence from the public record. *Id.* ¶¶ 12-27.

---

[1] Plaintiff also filed numerous additional procedural motions related to Defendant's Motion for Summary Judgment. The court describes those motions in the Procedural History below and will address them after it considers the merits of Defendant's dispositive motion.

### 1.   *Internal Affairs' Investigation*

Three months later, in March 2012, Internal Affairs concluded its inquiry and issued its Report of Investigation ("Internal Affairs Report"). Internal Affairs found that the allegations against Plaintiff were "not sustained" by the record and closed the investigation without taking any significant adverse employment action. *Id.* ¶ 19; Pl.'s Stmt. at 15, ¶ 19. Internal Affairs did send Plaintiff a Letter of Counseling advising him to avoid acting in ways that might lead to future potential appearances of impropriety. Def.'s Stmt. ¶¶ 20-21; Pl.'s Stmt. at 15-16, ¶ 20; Pl.'s Opp'n, Ex. 6, Investigative Report from Adrienne R. Rish to Lisa Shahade and William Hermann, ECF No. 29-6 [hereinafter OIG Report], at 3.

Not everyone within Internal Affairs, however, agreed with the outcome of Plaintiff's investigation. Officer Linda Dixon, the head of Internal Affairs at the time and the lead investigator's immediate supervisor, dissented from the decision not to hold Plaintiff accountable and refused to sign the final Internal Affairs Report. Pl.'s Stmt. at 7, ¶ 26. Internal Affairs nonetheless issued its Report and, on April 19, 2012, Officer Dixon sent a memo to the then-APD Chief of Police, expressing her disagreement with the Internal Affairs Report's conclusions. Def.'s Stmt. ¶ 28; OIG Report at 3. According to Plaintiff, Dixon then circumvented the APD chain of command and raised her dissatisfaction about the Internal Affairs Report directly with OIG. Pl.'s Stmt. at 7, ¶ 26-30. The record does not reveal Dixon's specific objections to Internal Affairs' findings.

### 2.   *OIG's Investigation*

Meanwhile, OIG's parallel investigation into Plaintiff's conduct continued, concluding six months later and reaching a far different conclusion than Internal Affairs. On October 12, 2012, OIG issued an Investigative Report ("the OIG Report"), finding that the allegations against

Plaintiff were in fact sustained by the evidence.  The OIG Report found that Plaintiff and his subordinate, Officer Bryant, jointly owned the Property and that Plaintiff had given preferential treatment in giving assignments to Bryant and others whom he had hired, which resulted in greater overtime pay for those employees.  OIG Report at 5, 12-14.  The OIG Report also concluded that Plaintiff (1) had intentionally misled both OIG and Internal Affairs investigators, and (2) had submitted false tax documents in connection with his purchase of the Property in potential violation of Maryland law.  *Id.* at 5-14.

OIG submitted its report to the APD's Acting Chief of Police at the time, Lisa Shahade. After reviewing the report, Shahade terminated Plaintiff from his position.  Def.'s Stmt. ¶¶ 53-54; *Id.*, Ex. J, Declaration of Lisa Shahade, ECF No. 29-14 [hereinafter Shahade Decl.], ¶ 13.

### B.     Procedural Background

#### *1.     Defendant's Motion for Summary Judgment*

On September 30, 2014, Plaintiff filed suit in this court, alleging:  (1) discrimination in violation of the District of Columbia Human Rights Act, D.C. Code § 14.01.1 *et seq.* (Count 1); and, (2) discrimination in violation of 42 U.S.C. § 1981 (Count 2).  *See generally* Compl.

On October 23, 2015, following discovery, Defendant filed a Motion for Summary Judgment, in which it argued that it had terminated Plaintiff for a legitimate non-discriminatory reason—specifically, his acts of misconduct and deceit, as detailed in the OIG Report. *See generally* Def.'s Mem. in Supp. of Mot. for Summ. Judg, ECF No. 29 [hereinafter Def.'s Mot.]. On December 24, 2015, Plaintiff filed his Opposition to Defendant's Motion for Summary Judgment, claiming that Defendant's proffered non-discriminatory reason for terminating him was a pretext for discrimination.  *See generally* Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 34

[hereinafter Pl.'s Opp'n].  On January 27, 2016, Defendant filed a Reply to Plaintiff's Opposition. See Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 41 [hereinafter Def.'s Reply].

       *2.*     *Additional Motions*

     In addition to Defendant's Motion for Summary Judgment, a host of procedural motions filed by Plaintiff are before the court. On January 8, 2016, Plaintiff filed a "Motion to Defer Ruling on Defendant's Motion for Summary Judgment Pending Additional Discovery," in which he requested leave to take additional discovery—namely, the depositions of the current APD Chief of Police, Polly Hanson, and a third-party investigator for the Laurel Police Department, John Superson. *See generally* Pl.'s Mem. in Supp. of Mot. to Defer Summ. J. for Add'l Discovery, ECF No. 37-1 [hereinafter Pl.'s Mot. to Defer Summ. J.].  Defendant opposed Plaintiff's request to re-open the record. *See generally* Def.'s Opp'n to Pl.'s Mot. to Defer Summ. J., ECF No. 39. The court will address the claimed relevance of the proposed additional discovery in the Discussion section below.

     On February 8, 2016, Plaintiff filed a "Motion for Leave to File a Surreply in Opposition to Defendant's Motion for Summary Judgment," seeking to supplement the record with evidence regarding Defendant's alleged failure to produce records relating to the OIG investigation during discovery. *See generally* Pl.'s Mem. in Supp. of Mot. to File Surreply, ECF No. 47-1 [hereinafter Pl.'s Mot. for Surreply].  Defendant opposed that motion, as well. *See generally* Def.'s Opp'n to Pl's Mot. for Surreply, ECF No. 50.

     On August 3, 2016, Plaintiff filed a third motion entitled "Motion to Supplement the Record on Summary Judgment," which sought to file—as an additional exhibit to Plaintiff's Opposition—an investigation report prepared by John Superson. *See generally* Pl.'s Mem. in Supp. of Mot. to Suppl. the Record on Summ. J., ECF No. 54-1 [hereinafter Pl.'s Mot. to Suppl.].

5

Defendant opposed that motion, too. *See generally*, Def.'s Opp'n to Pl's Mot. to Suppl., ECF No. 57.

Finally, on August 31, 2016, Plaintiff filed a "Motion for Leave to File Certificate of Authenticity of Records," which concerned the proposed Superson report. *See generally* Pl.'s Mot. to Incl. Cert. of Records, ECF No. 60. Having already opposed the motion to add that exhibit to the record, Defendant also opposed the filing of the certificate of authenticity. *See generally* Def.'s Opp'n to Pl.'s Mot. to Incl. Cert. of Records, ECF No. 61.

## III.   LEGAL STANDARD

Summary judgment will only be granted if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A non-material factual dispute is insufficient to prevent the court from granting summary judgment. *Id.*

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (footnote omitted) (citation and internal quotation marks omitted).  The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citation omitted).  However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324).  In other words, if the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).  Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV.   DISCUSSION

Acting Chief Shahade's decision to fire Plaintiff forms the basis of the parties' dispute. Plaintiff asserts that Defendant's proffered reason for terminating him was a pretext for discrimination.  He primarily contends that Dixon—the disgruntled Internal Affairs head who dissented from Internal Affairs' non-action against Plaintiff—was racially biased and that her racially-motivated complaint to OIG was the true motivating factor for his termination.  Plaintiff's theory, put another way, is that Dixon's racial animus so infected the OIG investigation process that Shahade's decision to fire Plaintiff, regardless of whether she herself was racially biased against him, must be considered the product of race discrimination.  Pl.'s Opp'n, at 11, 19-20. Plaintiff also asserts as further evidence of pretext that the APD did not similarly discipline

Dixon—who also had been accused of engaging in an inappropriate relationship with another APD Officer—because she is white. *Id*. at 7-8.

Defendant, on the other hand, denies that Dixon's limited involvement in the OIG investigation had any material impact or influence on its outcome. It further asserts that the OIG investigation was procedurally sound and entirely independent from the parallel Internal Affairs investigation. Def.'s Mot. at 16-18. Defendant also contests Plaintiff's assertion that Dixon was treated differently from Plaintiff because she is white. *Id*. at 14-16.

The court now turns to these arguments.

**A.     The Cat's Paw Argument**

Plaintiff asserts that his discrimination claims are based primarily on "a combination of a cat's paw theory and circumstantial evidence of racial discrimination." Pl.'s Opp'n at 19. Under what is known as a "cat's paw" theory of discrimination, "an employer may be held liable for discriminatory acts by a direct supervisor—even where that supervisor is not the final decisionmaker"—if the supervisor's discriminatory acts or opinions infect the employment decision to such an extent that the final decisionmaker is effectively the "conduit" for the supervisor's discrimination. *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016).

Here, Plaintiff blames Dixon—the then-head of Internal Affairs,[2] who refused to sign the Internal Affairs Report and then complained to OIG about the decision not to take action against him—for his plight. He contends that Dixon was racially biased and that her race-motivated complaint so infected the OIG investigation process that Shahade—the final decisionmaker— became the conduit for Dixon's discrimination. Pl.'s Opp'n, at 11, 19-20. Plaintiff offers three

---

[2] Although Dixon was not Plaintiff's supervisor, the court need not decide, for reasons that will become apparent, whether a cat's paw theory can apply to a non-supervisory employee who, as here, is alleged to have set in motion an investigation that ultimately leads to the termination of another employee.

pieces of evidence in support of his theory: (1) an affidavit from an Amtrak employee who had, years earlier, witnessed Dixon on television refuse to shake then President-elect Barack Obama's hand, Pl.'s Opp'n at 9; (2) affidavits from Amtrak employees detailing rumors that Dixon was having an affair with another APD officer who was openly racist, *id.* at 7-8; and (3) deposition testimony from another litigation in which Dixon admitted to bypassing the APD chain of command when she complained to OIG about the outcome of the Internal Affairs investigation, *id.* at 11-12.

In order to prevail on a cat's paw theory, a plaintiff must demonstrate that "[1] a supervisor perform[ed] an act motivated by [discriminatory animus], [2] that [was] intended by the supervisor to cause an adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Our Court of Appeals has made it clear, however, that a biased supervisor's indirect or limited involvement in an employment decision is not enough to sustain a cat's paw theory. Summary judgment for the employer is appropriate, for instance, when the ultimate decision to terminate was the product of an independent investigation. *See Hampton v. Vilsack*, 685 F.3d 1096, 1101-02 (D.C. Cir. 2012) (rejecting cat's paw liability where the biased supervisor "was in no way involved in the investigation of [the plaintiff's misconduct" and the deciding official had "conducted an independent review of the evidence"). On the other hand, if the evidence shows that the deciding official is "dependen[t] upon [a biased subordinate's] opinion" and is "[unable] independently to assess" the basis for sanctioning the employee, then summary judgment in the employer's favor must be denied. *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311-12 (D.C. Cir. 1998).

Accordingly, to be successful here, Plaintiff must present evidence from which a reasonable juror could infer that Dixon was both racially biased against Plaintiff and that, as a result, she materially influenced Shahade's decision to terminate Plaintiff. Plaintiff fails to do so.

First, the evidence on the record simply does not support an inference that Dixon was even racially biased towards Plaintiff. The fact that Dixon did not shake the President-elect's hand, without more, is plainly insufficient to sustain an inference that Dixon was motivated by racial animus towards Plaintiff. Refusing to shake the hand of the first African-American President does not necessarily make Dixon a racist; she simply may have disagreed with his politics or not liked him for some other reason. *See e.g., Shaw v. McHugh*, No. 12-CV-6834 CS, 2015 WL 1400069, at *10 (S.D.N.Y. Mar. 26, 2016) (statements that the plaintiff was "going to vote for Obama because he's your kind" did not support an inference of racial bias). In any event, such ambiguous behavior that is completely disconnected from the challenged employment action cannot give rise to an inference of racial animus. *See Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 666 (D.D.C. 1997) (holding that even overtly racist statements made without "a clearly demonstrated nexus to the adverse employment action at issue are not alone sufficient to withstand a motion for summary judgment").

Plaintiff's evidence that Dixon's rumored workplace paramour, Ed Thornton, was an overt racist fares no better. Such evidence does not establish that Dixon herself was a racist. And, even if Thornton's racism could be somehow imputed to Dixon, Plaintiff has come forward with no evidence that Dixon's complaint to OIG was racially motivated. Thus, Plaintiff has failed to

provide evidence to sustain the first element of his cat's paw theory: that Dixon's actions were motivated by discriminatory animus.

Second, and perhaps most important for present purposes, Plaintiff does not provide any evidence that Dixon had any influence whatsoever on Shahade's decision to terminate Plaintiff. *See Hampton*, 685 F.3d at 1101-02. There is no dispute that Shahade based her decision to terminate Plaintiff on the findings of the OIG Report. In a sworn affidavit, Shahade stated: "All told, based on my assessment of the OIG Report, which I had no reason to question or doubt in any way, I made the determination that Mr. Parker's employment should be terminated." Shahade Decl. ¶ 9; *id.* ¶ 13 (stating that Shahade "made the determination that Mr. Parker's employment should be terminated" "in reliance on the OIG report"). Shahade explained that "Parker's false statements and omissions to investigators . . . violated several important Amtrak and APD policies and procedures," *id.* ¶ 10; that "Parker's reported dishonesty and lack of candor [was] particularly troubling given his rank and status within the APD," *id.* ¶ 11; and that "Parker's false statements and omissions irreparably damaged his ability to fulfill his duties as an APD officer," including his ability to serve as a potential testifying witness, *id.* ¶ 12. Plaintiff offers no evidence to indicate that Shahade did not in fact rely on the OIG Report, or that she was motivated by racial animus in any way, and thus concedes that Shahade did not terminate him due to her own racial animus. *See* Pl.'s Stmt. at 23-24, ¶¶ 51-55.

Nor has Plaintiff offered any evidence that would create a genuine dispute of fact about the independence of the OIG investigation and Shahade's reasonable reliance on its findings. Plaintiff asserts that Dixon "was clearly in a position to influence" OIG "to take up the matter of allegations already found 'non-sustained' by her own Office of Internal Affairs." Pl.'s Opp'n at 19. The record, however, does not support Plaintiff's position. Instead, it establishes that the OIG

investigation had actually commenced *before* the Internal Affairs Report issued. Defendant presented uncontested evidence—in the form of an affidavit from the OIG officer in charge of that investigation, Renee Jackson—who attested that, on September 30, 2011, OIG had received an anonymous complaint about Plaintiff's conduct, and that she "opened an investigative file into the matter on January 24, 2012"—six weeks before Internal Affairs issued its Report—"at which point [she] began to conduct preliminary research and gather background information." Def.'s Mot., Ex. K, Decl. of Renee Jackson, ECF No. 29-15 [hereinafter Jackson Decl.], ¶¶ 3, 5. The only evidence that Plaintiff offers to establish that Dixon was responsible for starting the OIG investigation is sworn deposition testimony given by her in another, non-related case. But in that testimony Dixon acknowledged that she complained to OIG *after* Internal Affairs had cleared Plaintiff.[3] *See* Pl.'s Opp'n at 11-12; *id.*, Ex. 15, *Anderson v. Amtrak*, Deposition of Linda Dixon, ECF No. 34-18, at 65-67. Thus, the timing simply does not add up. And Plaintiff has provided no other evidence to support his contention that Dixon influenced OIG to "take up" the investigation of Plaintiff.

Furthermore, there is no genuine dispute as to Dixon's limited role in the OIG investigation. According to Renee Jackson, she first learned of the Internal Affairs investigation in June 2012 and thereafter spoke to Dixon "about the scope and status of the [Internal Affairs] investigation." Jackson Decl. ¶ 11. That conversation, Jackson attested, "did not influence my investigative focus and [Dixon] certainly did not impact the investigation's results. . . . OIG carried out its own investigation, gathered its own evidence, and conducted its own interviews." *Id.* ¶ 12. The OIG Report itself corroborates Jackson's statement, as it refers only once to Dixon—it notes

---

[3] Defendant urges the court to deem inadmissible Dixon's deposition from the other case under Federal Rule of Civil Procedure 32(a)(8). Def.'s Reply at 10. The court need not reach that issue, for even assuming the prior deposition's admissibility, it fails to create a genuine dispute of material fact.

that she sent a memo to then-Chief O'Connor—but otherwise relies exclusively on witness interviews and public records to draw its conclusions. *See generally* OIG Report. Plaintiff offers no evidence to contradict Jackson's statements. *See* Pl.'s Stmt. at 23, ¶ 51; 27, ¶¶ 73-74. Thus, this is not a case in which the decisionmaker was "dependen[t] upon [a biased subordinate's] opinion" and "[unable] independently to assess" the basis for sanctioning the employee. *Griffin*, 142 F.3d at 1311. Plaintiff's cat's paw theory is simply unsupported by any credible record evidence.

### B.      Other Evidence of Discrimination

As noted, Plaintiff asserts that his discrimination claims are based on "a combination of a cat's paw theory and circumstantial evidence of racial discrimination." Pl.'s Opp'n at 19. Among the "circumstantial evidence" that Plaintiff offers is: (1) the "unprecedented" nature of the OIG investigation and other purported problems with the investigation; (2) that other similarly situated white officers were treated more favorably; and (3) that Amtrak discriminated against another senior-level African-American officer. *Id.* at 6-20. None of this evidence, however, gives rise to an inference of pretext.

#### 1.      The OIG Investigation

Plaintiff claims that various aspects of the OIG investigation constitute evidence of discrimination. First, Plaintiff presents several affidavits asserting that OIG's effective override of Internal Affairs was unprecedented. Pl.'s Opp'n, Ex. 12, District of Columbia Office of Human Rights Interviews Transcripts of Derrick White, James Cook, and Phil A. Arnold, ECF No. 34-15, at 5-6, 8, 11. He also argues that OIG's investigation was an "outright violation of policy," as outlined in ████████████████████████████████████████████

████████  Pl.'s Opp'n at 20; *id.*, Ex. 13, William Parker's Confidential Suppl. Stmt. of Fact, ECF

No. 36 [hereinafter Pl.'s Suppl. Stmt.].   Finally, Plaintiff contends that OIG committed "[w]holesale violations of fundamental tenants of investigative work," such that those violations alone give to an inference of pretext. Pl.'s Opp'n at 20.  Each of Plaintiff's arguments falls apart upon closer inspection.

To begin, the supposedly unprecedented nature of the OIG investigation in this case does not give rise to an inference of discriminatory motive.  At a minimum, there is a factual dispute as to whether OIG's parallel investigation of Plaintiff was truly unprecedented. *See e.g.*, Jackson Decl. ¶ 11 ("OIG and APD sometimes conduct parallel investigations, particularly when it concerns matters involving the [APD].").  But even if it was unprecedented, that fact, without more, does not give rise to an inference of discrimination.  Had Plaintiff attempted to show, for example, that OIG has not conducted parallel investigations when similarly situated white officers have engaged in similar conduct, Plaintiff might then have succeeded in establishing pretext. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'") (citation omitted).  But he made no effort to make such a showing here. Moreover, given that OIG found that Plaintiff had lied to Internal Affairs—impacting Internal Affairs' decision not to discipline him—it is hardly surprising that its parallel investigation resulted in his firing.  While it may be true that Plaintiff's discipline was unusual—even the first of its kind—that fact alone in this case does not create a genuine dispute of fact as to his employer's motive for firing him.



*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (holding that on summary judgment in a race discrimination case the court must review the record as a whole in order to determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race").

Finally, Plaintiff argues that OGI committed "[w]holesale violations of fundamental tenets of investigative work," which give rise to an inference of discrimination. Pl.'s Opp'n at 20.

Although it is true that an "employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination can also permit a factfinder to find pretext," *Burley*, 801 F.3d at 296, Plaintiff has failed to establish any deficiency in OIG's investigation.  He appears to contend that the "fundamental" flaw of OIG's investigation was that it "fail[ed] to record and preserve interviews—or even to document the opening of [its] investigation," which he characterizes as the "hallmarks of an unprofessional operation." Pl.'s Opp'n at 10.  But Plaintiff has presented no evidence to support that claim.  For example, Plaintiff provides no testimony from OIG's lead investigator, Renee Jackson, demonstrating that OIG's investigation was flawed in the ways that he claims.  Nor has he supported his claim with any expert testimony.[4]  Simply saying the investigation was fundamentally flawed does not make it so.  In short, Plaintiff has failed to show that any aspect of the OIG investigation negates or undermines Defendant's race-neutral explanation for his firing.

    2.    *Comparators*

    Plaintiff also attempts to demonstrate pretext through "comparator" evidence, whereby a plaintiff can demonstrate an employer's discriminatory intent "by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).  To succeed under this approach, a plaintiff must affirmatively demonstrate "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301 (citing *Coleman v. Donahoe*, 667 F.3d 835, 846-47 (7th Cir. 2012)).

---

[4] Part of the reason that Plaintiff is unable to show any flaw in OIG's investigation is that he did not obtain the underlying investigative record in discovery. *See* Def.'s Reply, Ex. M, Decl. of Matthew J. Sharbaugh, ECF No. 59-2, ¶¶ 3-9.

Plaintiff's argument regarding comparators centers only on Dixon and her alleged workplace affair with Officer Thornton.[5]   According to Plaintiff, Dixon and Thornton carried on an illicit relationship and misused Amtrak funds, but were neither investigated nor disciplined by Amtrak because they are white.  Pls.' Opp'n at 7 (alluding to "the couple's open behavior and lack of any consequences in their employment at Amtrak").  ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████  Thus, Plaintiff fails to make the required showing to support his comparator theory. *See Burley*, 801 F.3d at 301.

   3.     *"Me Too" Evidence*

Plaintiff also asks the court to infer pretext on a related theory that there is "evidence of a similar discriminatory scheme against Deputy Chief Keven Gray effectuated by the [OIG]."  Pl.'s Opp'n at 20.  While courts may consider evidence of discrimination against other employees to support an inference of pretext in certain contexts, *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 385 (2008), courts have held this type of evidence—so-called "me too" evidence—to be probative of an employer's discriminatory intent only if the plaintiff can demonstrate that "such past discriminatory behavior by the employer is close in time to the events at issue in the case, the same decisionmakers were involved, the witness and the plaintiff were treated in a similar manner,

---

[5] Plaintiff originally identified a third potential comparator—Inspector Maureen Powers—during discovery, Def.'s Mot. at 13-14; Def.'s Stmt. ¶ 59, but, as Plaintiff has failed to respond to Defendant's arguments regarding Powers, the court will treat them as conceded.  *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."); *Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.").

and the witness and the plaintiff were otherwise similarly situated." *Nuskey v. Hochberg*, 723 F.

Supp. 2d 229, 233 (D.D.C. 2010); *see also Sprint,* 552 U.S. at 385 (2008); *Hendricks v. Geithner*,

568 F.3d 1008, 1010 (D.C. Cir. 2009).

Plaintiff's argument that Gray's treatment supplies evidence to support his discriminatory

treatment fails for a number of reasons. First, Plaintiff and Gray were not terminated by the same

individual. Plaintiff was terminated by Acting Chief of Police Shahade, whereas Gray was

terminated by her successor, Chief of Police Polly Hanson. *See* Pl.'s Opp'n, Ex. 5, Affidavit of

Keven Gray, ECF No. 34-8, ¶¶ 25-26. Second, Gray was terminated nearly one year after Plaintiff.

*Id*. Third, Gray was not similarly situated to Plaintiff—in fact, he was Plaintiff's immediate

supervisor. *Id*. ¶ 7. And, finally, Plaintiff was found to have engaged in far more egregious

conduct than Gray. He was found to have lied to Internal Affairs investigators and engaged in

conduct that arguably violated state laws, whereas Gray was accused of receiving outside

compensation for working with a high school football program. *Id*. ¶¶ 23-24. Accordingly,

Plaintiff's "me too" evidence also fails to raise an inference of pretext sufficient to survive

summary judgment.

### C.    Plaintiff's Remaining Motions

The court now turns to the remaining motions filed by Plaintiff.

#### 1.    *Motion for Additional Discovery*

Plaintiff's Rule 56(d) Motion for Additional Discovery asks the court to defer ruling on

Defendant's Motion for Summary Judgment so that Plaintiff can depose Chief Hanson and John

Superson, a retired police officer from Howard County, Maryland, who conducts background

checks. Pl.'s Mot. to Defer Summ. J. at 2-3. The need for their testimony, Plaintiff argues, arises

from his recent discovery of a statement Hanson made to Superson. Former Amtrak Deputy Chief

Gray now has a position with the police department in Laurel, Maryland. Superson conducted Gray's background check. Superson supposedly told Gray that Chief Hanson had told Superson that she (Chief Hanson) had "two commanders," who "had desks" in OIG's office, who she had terminated. *Id.*, Aff. of John Racin, ECF No. 37-2, at 2. Plaintiff believes that Hanson's reference to "two commanders" only could mean Dixon and Thornton. Plaintiff now says that he needs to depose Hanson and Superson to "show that Ms. Dixon and Mr. Thornton were in even better position to influence the course of events in the [OIG] than the record shows otherwise." Pl.'s Mot. to Defer Summ. J. at 2-3.

The court denies Plaintiff's motion because Plaintiff did not exercise the requisite degree of diligence required under Rule 56(d) during the discovery period. *See U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26, n. 5 (D.C. Cir. 2014) ("A district court may find the non-movant's diligence relevant to the requirement that the non-movant 'explain why he could not produce the facts in opposition to the motion for summary judgment.'") (quoting *Convertino v. DOJ*, 684 F.3d 93, 99-100 (D.C. Cir. 2012)). Plaintiff had the opportunity in discovery to obtain from Dixon the information that he now indirectly seeks from Hanson and Superson. But he failed to depose Dixon during the discovery period. *See* Order Denying Plaintiff's Motion for Leave to Conduct Additional Depositions, ECF No. 23. The court will not defer ruling on summary judgment so that Plaintiff can obtain evidence that he easily could have obtained through diligence during the discovery period.[6]

---

[6] Additionally, Plaintiff has not sufficiently demonstrated how Hanson or Superson could supply evidence that is "necessary to the litigation." *Convertino*, 684 F.3d at 99. Hanson was not involved in Plaintiff's termination and so her testimony would shed no light on Dixon's and Thorton's role in OIG's investigation. Superson is even far more removed, as his proposed testimony would only concern what Hanson supposedly told him.

      2.     *Motion for Leave to File a Surreply*

Plaintiff seeks to file a surreply to respond to Amtrak's contention in its Opposition that OIG "created an investigative file and documented its witness interviews during its work on the case." Pl.'s Mot. for Surreply at 1. According to Plaintiff, based on Defendant's discovery responses, he was under the impression that such investigative information did not exist. *See id.*

The court denies leave to file the surreply. *See Banner Health v. Sebelius,* 905 F. Supp. 2d 174, 187 (D.D.C. 2012) ("[S]urreplies are generally disfavored . . . and the determination as to whether to grant or deny leave is entrusted to the sound discretion of the district court[.]") (citations omitted). As already discussed, Plaintiff did not come forward with any evidence to show, as he claims, the "fundamental" deficiencies that the OIG investigation suffered from. As a result, the court did not need to consider whether the record presented a genuine dispute of fact on that issue. Accordingly, the court finds that Plaintiff's proposed surreply is unnecessary.

      3.     *Motions to Supplement the Record and For Leave to File Certificate of*
            *Authenticity of Records*

Finally, Plaintiff's Motion to Supplement the Record on Summary Judgment also is denied. That motion seeks to supplement the record with a "Background Investigation Report" prepared by Superson relating to Gray's hiring as Deputy Chief of Police in Laurel, Maryland. Pl.'s Mot. to Suppl. at 1. As discussed above, the court finds that the events concerning Gray's termination do not support Plaintiff's discrimination claims. And testimony from Superson would be simply too far afield to be relevant. The court, therefore, denies Plaintiff's Motion to Supplement. It also, accordingly, denies Plaintiff's Motion for Leave to File Certificate of Authenticity of Records, which seeks to establish the authenticity of Superson's Report.

## IV.   CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment. The court denies Plaintiff's (1) Rule 56(d) Motion for Additional Discovery; (2) Motion for Leave to File a Surreply; (3) Motion to Supplement the Record on Summary Judgment; and, (4) Motion for Leave to File Certificate of Authenticity of Records of the Superson Report.

A separate order accompanies this Memorandum Opinion.

Dated:  September 28, 2016

Amit P. Mehta
United States District Judge